FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2005 FEB 11 P 2: 01

Case No. 3:05 - CIV - 149 - J - 25MmH

| | |
|---|---|
| JAMES MCCABE, Derivatively On Behalf of FIDELITY NATIONAL FINANCIAL, INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| WILLIAM P. FOLEY, II; RAYMOND R. QUIRK; ALAN L. STINSON; FRANK P. WILLEY; TERRY N. CHRISTENSEN; WILLIAM A. IMPARATO; DONALD M. KOLL; WILLIAM LYON; CARY H. THOMPSON; DANIEL D. LANE; JOHN F. FARRELL, JR.; PHILIP G. HEASLEY; WILLIE D. DAVIS; J. THOMAS TALBOT; and RICHARD P. TOFT, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| - and - | ) ) ) |
| FIDELITY NATIONAL FINANCIAL, INC., a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) ) |
| | ) <u>JURY TRIAL DEMANDED</u> |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS
MISMANAGEMENT, WASTE OF CORPORATE
<u>ASSETS AND UNJUST ENRICHMENT</u>**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Fidelity National Financial, Inc. ("Fidelity" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between October 1999 and the present (the "Relevant Period") and that have caused substantial losses to Fidelity and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendants, and the amount in controversy exceeds $75,000. This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Fidelity occurred in this District, and

2

defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.     Fidelity is a title insurance and diversified real estate information services and solutions company that operates in four business segments: title insurance, financial institution processing and outsourcing, real estate information services and specialty insurance. The title insurance segment provides core title insurance and escrow services. The financial institution processing and outsourcing segment consists primarily of the operations of Fidelity Information Services, Inc. The real estate information services segment offers the complementary specialized products and services required to execute and close a real estate transaction that are not offered by the title insurance segment. The specialty insurance segment issues flood, home warranty and homeowners insurance policies.

6.     On October 14, 2004, *CBS MarketWatch* issued an article entitled "Spitzer attacks insurance industry." The article stated in part:

> In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.
>
> Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."
>
> Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.
>
> Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.
>
> "The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that

there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

Shares of Marsh AIG and other leading insurance companies and brokers slumped. Marsh dropped 14 percent to $39.70 and AIG lost nine percent to $60.70.

Ace Ltd., Chubb Corp., Hartford Financial, and Munich Re's Munich American Risk Partners were also involved in the scheme, Spitzer said.

Interestingly, AIG is headed by longtime CEO Hank Greenberg. His sons Evan Greenberg and Jeff Greenberg are the CEOs, respectively, of reinsurer Ace and broker Marsh & McLennan.

Ace spokesman John Herbkersman said the company has received subpoenas from Spitzer as part of the investigation and is cooperating.

"The Hartford is cooperating fully with the New York Attorney's investigation," said ... a spokeswoman for the company.

7.      Upon revelation of these illegal acts, the Company's shares fell to $36.58 a loss of 2%.

8.      During the Relevant Period defendants disseminated materially false and misleading financial statements. The true facts which were known by each of the defendants, but concealed from the investing public during the Relevant Period, were as follows:

(a)      That the Company was paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements;"

(b)      That by concealing these "contingent commissions" and such "contingent commission agreements" the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens - if not hundreds - of millions of dollars; and

(c)      That as a result of (a)-(b) above, as more fully described herein the Company's prior reported revenue and income was grossly overstated.

## THE PARTIES

9.      Plaintiff James McCabe is, and was at times relevant hereto, an owner and holder of Fidelity common stock.  Plaintiff McCabe is a citizen of Colorado.

10.      Nominal defendant Fidelity is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 601 Riverside Avenue, Jacksonville, Florida, 32204.  Fidelity is a title insurance and diversified real estate information services and solutions company that operates in four business segments: title insurance, financial institution processing and outsourcing, real estate information services and specialty insurance.  The title insurance segment provides core title insurance and escrow services.  The financial institution processing and outsourcing segment consists primarily of the operations of Fidelity Information Services, Inc.  The real estate information services segment offers the complementary specialized products and services required to execute and close a real estate transaction that are not offered by the title insurance segment.  The specialty insurance segment issues flood, home warranty and homeowners insurance policies.

11.      Defendant William P. Foley, II ("Foley") is, and at all times relevant hereto was, Chairman of the Board of Directors (the "Board"), Chief Executive Officer ("CEO") and a director of Fidelity.  Because of Foley's positions, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Foley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange

Commission ("SEC") filings. For FY:99 FY:00, FY:01, FY:02 and FY:03, Fidelity paid defendant Foley $1,155,337, $3,289,694, $3,982,021, $4,050,730 and $15,315,273, respectively, in salary, bonus and other compensation, and granted him 207,994, 516,610, 532,400, 303,875 and 8,520 options to purchase Fidelity stock, respectively. During the Relevant Period, Foley sold 1,171,276 shares of Fidelity stock for proceeds of over $31.3 million. Foley is a citizen of California.

12. Defendant Raymond R. Quirk ("Quirk") is, and at times relevant hereto was, President of Fidelity since January 2003. Because of Quirk's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Quirk participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, Fidelity paid defendant Quirk $3,651,704 in salary, bonus and other compensation, and granted him 8,250 options to purchase Fidelity stock. During the Relevant Period, Quirk sold 63,068 shares of Fidelity stock for proceeds of over $1.7 million. Quirk is a citizen of California.

13. Defendant Alan L. Stinson ("Stinson") is, and at all times relevant hereto was, Executive Vice President and Chief Financial Officer of Fidelity. Because of Stinson's positions, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future

business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Stinson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:99, FY:00, FY:01, FY:02 and FY:03, Fidelity paid defendant Stinson $346,023, $892,947 $1,057,412, $1,108,526 and $3,027,425, respectively, in salary, bonus and other compensation, and granted him 93,499, 83,372 and 87,313 options to purchase Fidelity stock in FY:00, FY:01 and FY:02, respectively. During the Relevant Period, Stinson sold 30,250 shares of Fidelity stock for proceeds of over $905,080. Stinson is a citizen of Florida.

14.    Defendant Frank P. Willey ("Willey") is, and at all times relevant hereto was, Vice Chairman of the Board and a director of Fidelity. Because of Willey's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Willey participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:99 FY:00 and FY:01, Fidelity paid defendant Willey $ 436,830, $679,910 and $1,007,739 respectively, in salary, bonus and other compensation, and granted him 33,000, 251,820 and 39,867 options to purchase Fidelity stock, respectively. During the

Relevant Period, Willey sold 360,674 shares of Fidelity stock for proceeds of over $9.9 million. Willey is a citizen of California.

15.    Defendant Terry N. Christensen ("Christensen") is, and at times relevant hereto was, a director of Fidelity since 2002. Because of Christensen's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Christensen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Christensen is a citizen of California.

16.    Defendant William A. Imparato ("Imparato") is, and at all times relevant hereto was, a director of Fidelity. Because of Imparato's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Imparato participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Imparato sold 29,078 shares of Fidelity stock for proceeds of $759,231.40. Imparato is a citizen of Arizona.

17.    Defendant Donald M. Koll ("Koll") is, and at all times relevant hereto was, a director of Fidelity. Because of Koll's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Koll participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Koll sold 38,924 shares of Fidelity stock for proceeds of over $1 million. Koll is a citizen of California.

18.    Defendant William Lyon ("Lyon") is, and at all times relevant hereto was, a director of Fidelity. Because of Lyon's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Lyon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Lyon is a citizen of California.

19.    Defendant Cary H. Thompson ("Thompson") is, and at all times relevant hereto was, a director of Fidelity. Because of Thompson's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements"

as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Thompson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Thompson sold 72,510 shares of Fidelity stock for proceeds of over $2 million. Thompson is a citizen of New York.

20.     Defendant Daniel D. Lane ("Lane") is, and at all times relevant hereto was, a director of Fidelity. Because of Lane's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Lane participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Lane sold 82,292 shares of Fidelity stock for proceeds of over $2.7 million. Lane is a citizen of California.

21.     Defendant John F. Farrell, Jr. ("Farrell") is, and at times relevant hereto was, a director of Fidelity since 2000. Because of Farrell's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal

corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Farrell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Farrell is a citizen of Connecticut.

22.    Defendant Philip G. Heasley ("Heasley") is, and at times relevant hereto was, a director of Fidelity since 2000. Because of Heasley's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Heasley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Heasley sold 20,418 shares of Fidelity stock for proceeds of $729,943.50. Heasley is a citizen of Minnesota.

23.    Defendant Willie D. Davis ("Davis") is, and at times relevant hereto was, a director of Fidelity since December 2003. Because of Davis' position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and

other information provided to him in connection therewith. During the Relevant Period, Davis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Davis is a citizen of California.

24.     Defendant J. Thomas Talbot ("Talbot") was, at times relevant hereto, a director of Fidelity until September 2003. Because of Talbot's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Talbot participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Talbot sold 80,140 shares of Fidelity stock for proceeds of over $2.4 million. Talbot is a citizen of California.

25.     Defendant Richard P. Toft ("Toft") was, at times relevant hereto, a director of Fidelity until April 2002. Because of Toft's position, he knew the adverse non-public information about the business of Fidelity, specifically, its paying illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Toft participated in the issuance of false and/or misleading statements, including the preparation

of the false and/or misleading press releases and SEC filings. During the Relevant Period, Toft sold 44,150 shares of Fidelity stock for proceeds of over $1.4 million. Toft is a citizen of Illinois.

26.     The defendants identified in ¶¶11, 14-25 are referred to herein as the "Director Defendants." The defendants identified in ¶¶11-13 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶11-14, 16-17, 19-20, 22-25 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors and/or fiduciaries of Fidelity and because of their ability to control the business and corporate affairs of Fidelity, the Individual Defendants owed Fidelity and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Fidelity in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fidelity and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to Fidelity and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance,

management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fidelity, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Fidelity, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Fidelity.

30.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fidelity, and was at all times acting within the course and scope of such agency.

31.    To discharge their duties, the officers and directors of Fidelity were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Fidelity were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Fidelity conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fidelity, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Fidelity's Board during the Relevant Period.

33.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, Fidelity has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending Fidelity and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

34.    Moreover, these actions have irreparably damaged Fidelity's corporate image and goodwill.  For at least the foreseeable future, Fidelity will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Fidelity's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

36.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) dispose of over $55 million of their personally held stock; (iii) use the artificially inflated Company stock to complete a public offering of 7,000,000 shares at $33.50 per share in January 2001; (iv) acquire Chicago Title Inc., ATTELL Information Systems Inc., Fidelity National Information Solutions Inc., Aurum Technology, Inc., Vistainfo Inc., and InterCept, Inc.; (v) acquire all of the operating assets of Northwest Mortgage Services, Inc; (vi) maintain the Individual Defendants' executive and directorial positions at Fidelity and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (vii) deceive the investing public, including shareholders of Fidelity, regarding the Individual Defendants' management of Fidelity's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 1999 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Fidelity was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Fidelity's financial performance and future business prospects, as alleged herein.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the

Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Fidelity common stock so they could: (i) dispose of over $55 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; (iii) use the artificially inflated Company stock to complete a public offering of 7,000,000 shares at $33.50 per share in January 2001; (iv) acquire Chicago Title Inc., ATTELL Information Systems Inc., Fidelity National Information Solutions Inc., Aurum Technology, Inc., Vistainfo Inc., and InterCept, Inc.; and (v) acquire all of the operating assets of Northwest Mortgage Services, Inc.

39.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

41.    Fidelity is a provider of products and outsourced services and solutions to financial institutions and the real estate industry.  Fidelity is also a leading provider of information-based technology solutions and processing services to financial institutions and the mortgage and financial services industries through its subsidiary Fidelity Information Services, Inc. Fidelity Information Services' software processes nearly 50 percent of all U.S. residential mortgages, it has processing and technology relationships with 45 of the top 50 U.S. banks as well as more than 3,200 community-based financial institutions and has clients in more than 50 countries who rely on its processing and outsourcing products and services. Fidelity is the nation's largest title insurance company and also provides other real estate-related services such as escrow, flood and tax certifications with life of loan monitoring, merged credit reporting, property valuations and appraisals, default management, relocation services, flood, homeowners and home warranty insurance, exchange intermediary services, mortgage loan aggregation and fulfillment, multiple listing services software, mortgage loan origination software, collateral scoring analytics and real property data.

42.    There are basically three types of entities in the insurance market.  First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage.  Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

43.     In this structure, the client makes two types of payments: (i) it pays its broker an advisory fee or a commission for locating the best insurer; and (ii) it pays the chosen insurance company premiums for the coverage itself. When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients - particularly large commercial clients - break out the broker's fee and pay it directly to the broker.

44.     In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients. These are called contingent commissions and come from insurance companies pursuant to arrangements generally known as contingent commission agreements. The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (i) how much business the broker's clients place with the insurance company; (ii) how many of the broker's clients renew policies with the insurance company; and (iii) the profitability of the business placed by the broker."

## IMPROPER STATEMENTS

45.     On December 20, 1999, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Sets Meeting Date." The press release stated in part:

> Fidelity National Financial, Inc., a diversified real estate services company today announced that December 30, 1999 is the record date for a special meeting of Fidelity National Financial, Inc. stockholders to consider the proposed merger with Chicago Title Corporation.
>
> The stockholder meeting will be held at Fess Parker's Doubletree Resort in Santa Barbara, California on February 9, 2000 at 10:00 a.m.
>
> "The setting of our respective shareholders' meetings and our substantial progress on regulatory issues reinforces our belief that the

transaction will close during the first quarter of 2000," said William P. Foley, II, Chairman and Chief Executive Officer of Fidelity National Financial, Inc.

Headquartered in Irvine, California, Fidelity National Financial, Inc. is one of the largest national title insurance underwriters and also provides diversified real estate services. The company does business in 49 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Fidelity, through its principal subsidiaries, issues title insurance polices and performs other title-related services such as escrow, collection and trust activities, real estate information and technology services, trustee's sale guarantees, credit reporting, attorney services, flood certifications, real estate tax services, reconveyances, recording, foreclosure publishing and posting services and exchange intermediary services in connection with real estate transactions.

46.     On December 23, 1999, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces A $.10 Quarterly Cash Dividend."  The press release stated in part:

Fidelity National Financial, Inc., a diversified real estate services company today announced that its board of directors declared a quarterly cash dividend in the amount of $.10 per share. The dividend will be payable on January 18, 2000 to stockholders of record as of January 3, 2000.

Headquartered in Irvine, California, Fidelity National Financial, Inc. is one of the largest national title insurance underwriters and also provides diversified real estate services. The company does business in 49 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Fidelity, through its principal subsidiaries, issues title insurance polices and performs other title-related services such as escrow, collection and trust activities, real estate information and technology services, trustee's sale guarantees, credit reporting, attorney services, flood certifications, real estate tax services, reconveyances, recording, foreclosure publishing and posting services and exchange intermediary services in connection with real estate transactions.

47.     On March 10, 2000, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces the Completion of the Acquisition Of the Operating Assets of Northwest Mortgage Services, Inc." The press release stated in part:

Fidelity National Financial, Inc., a diversified real estate services company, announced the completion of the acquisition of the operating assets of Minnesota-based Northwest Mortgage Services, Inc. ("Northwest") a

nationwide default management services company. The acquired assets included the national outsource operations, the network of affiliated law firms, the extensive default processing and management systems and the California foreclosure and trustee operations. The purchase price for the assets was $5,650,000 of which $1,500,000 was paid in cash at the closing and the balance of $4,050,000 will be paid in FNF common stock valued at $16.00 per share. The purchase price is subject to adjustment based on the audited closing financial statements.

William P. Foley II, Chairman of Fidelity National Financial, stated, "The acquisition of the operating assets of Northwest Mortgage Services immediately gives Fidelity access to a national outsourcing capability and a full platform of default services through a nationwide network of affiliated law firms. The expansion of our national default service capabilities is strategically complimentary to our current planned acquisition of Chicago Title Corporation (NYSE: CTZ)." Mr. Foley also stated, "Cindy Bird has been appointed as President of the newly formed division, Fidelity National Default Solutions, which will include all our current foreclosure and REO title, escrow, loss mitigation, asset management and field services, along with the operating assets acquired from Northwest."

48.    On March 20, 2000, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc., Completes Acquisition of Chicago Title Corporation; Merger Creates Title Insurance Leader." The press release stated in part:

Fidelity National Financial, Inc., today announced that it has completed its acquisition of Chicago Title Corporation, bringing together two of the top companies in the title insurance and real estate services business to form the market leader. The parent company will continue under the Fidelity National Financial, Inc. name and each of the major title insurance subsidiaries now owned by Fidelity National Financial -- Fidelity National Title, Chicago Title, Ticor Title, Security Union Title and Alamo Title -- will continue to operate as independent brands.

William P. Foley, II, Chairman and Chief Executive Officer of Fidelity said, "This merger makes possible the fulfillment of our vision: to be the industry leader, capable of providing superior customer service and equally outstanding returns to shareholders. We have created the blueprint for being a champion in the changing real estate services marketplace of the new millennium."

Foley added, "Together, we outperform our competition in all facets of our business: commercial real estate, residential loan origination and other lender products. We will work vigorously to maintain and enhance our industry leading position by combining two great organizations without losing the qualities that made both companies great in the first place."

***

Fidelity is now the largest title insurer and provider of real estate-related products and services in the world, distinguished by an unsurpassed distribution system comprising more than 1,000 offices and 7,000 agents, leading market share in excess of 30 percent, geographic diversity, complementary business mixes and the strongest financial position in the industry.

In 1999, pro forma revenue and net earnings on a combined basis were $3.4 billion and $177 million, respectively, prior to cost savings, synergies, the impact of goodwill and other one-time charges. At December 31, 1999, the combined entity had total assets approaching $3 billion and net worth of approximately $1 billion, prior to adjustments related to purchase accounting, making it the largest and best capitalized company in the industry. The new organization also has total cash and investments of approximately $2.0 billion.

49.     On May 2, 2000, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces First Quarter Earnings." The press release stated in part:

Fidelity National Financial, Inc. the nation's largest provider of title insurance and real estate related products and services, today announced revenues and earnings for the quarter ended March 31, 2000.

Revenues and earnings for the first quarter of 2000 include the results of operations of the former Chicago Title Corporation for the 11-day period subsequent to March 20, 2000, the merger date, through March 31, 2000.

Earnings for the quarter were $15,240,000, or $.45 per diluted share, compared to earnings of $20,030,000, or $.60 per diluted share, for the first quarter of 1999. Earnings for the quarter ended March 31, 2000 exclude $13,371,000, or $.39 per diluted share, of certain non-recurring charges, after applicable income taxes. First quarter 2000 earnings including the effect of the non-recurring charges were $1,869,000, or $.06, per diluted share.

First quarter 2000 revenue was $377,657,000 compared to $344,274,000 in the first quarter of 1999.

50.     On July 25, 2000, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces Second Quarter Earnings." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate-related products and services, today announced revenues and operating results for the three and six months ended June 30, 2000. Revenues and operating results for the quarter and year-to-date periods include the operating results for the former Chicago Title Corporation from and after March 20, 2000, the merger date.

- Excluding goodwill amortization, net cash earnings for the second quarter of 2000 were $42.9 million, or $0.62 per diluted share, compared with net cash earnings of $25.3 million, or $0.80 per diluted share for the second quarter of 1999
- Net cash earnings for the six-month period ending June 30, 2000, excluding goodwill amortization and excluding certain non-recurring, non-title related charges of $13.4 million, were $59.8 million, or $1.17 per diluted share as compared with net cash earnings of $45.9 million, or $1.41 per diluted share for the corresponding prior-year period
- After goodwill amortization, net earnings were $31.4 million, or $0.46 per diluted share for the second quarter of 2000, compared with net earnings of $23.7 million, or $0.75 per diluted share for the second quarter of 1999
- Net earnings for the six-month period ended June 30, 2000, after goodwill amortization were $46.6 million, or $0.91 per diluted share, compared with $43.5 million, or $1.35 per diluted share for the corresponding 1999 period. Net earnings for the six-month period of 2000 exclude $13.4 million, or $0.26 per diluted share, of certain non-recurring, non-title related charges incurred during the first quarter of 2000. Net earnings for the six months ended June 30, 2000 including the effect of the non-recurring, non-title related charges were $33.2 million, or $0.65 per diluted share
- Revenues for the second quarter of 2000 totaled $757.6 million as compared with $357.8 million in the second quarter of 1999. Revenues for the six-month period ended June 30, 2000 were $1.135 billion as compared with $702.1 million for the corresponding prior-year period

"We are extremely pleased with the second quarter results, particularly with net cash earnings per diluted share of $0.62. Despite the continued volatility in interest rates, we are excited and encouraged by the results of our five core brands -- Fidelity Title, Chicago Title, Ticor Title, Alamo Title and Security Union Title," said William P. Foley, II, chairman and chief executive officer of Fidelity National Financial, Inc.

51.    On October 25, 2000, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial Reports 3rd Quarter Net Cash EPS of $.68." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and nine-month periods ended September 30, 2000. These results reflect the acquisition of Chicago Title on March 20, 2000. Therefore, prior year comparisons may not be meaningful.

Net cash earnings, which exclude goodwill amortization, were $47.9 million for the third quarter of 2000, compared with $20.2 million for the third quarter of 1999. Net cash earnings per diluted share were $.68 versus $.65 in the prior year period.

Net earnings were $37.6 million for the third quarter of 2000, compared with $18.6 million for the third quarter of 1999. Net earnings per diluted share were $.54 versus $.60 in the prior year period.

For the nine-month period ended September 30, 2000, net cash earnings, excluding certain non-recurring, non-title related charges, were $107.7 million, compared with $66.1 million for the prior year period. Net cash earnings per diluted share, excluding those charges, were $1.87 for the nine-month period ended September 30, 2000 versus $2.06 in the prior year period.

For the nine-month period ended September 30, 2000, net earnings, excluding certain non-recurring, non-title related charges, were $84.2 million, compared with $62.1 million for the prior year period. Net earnings per diluted share, excluding those charges, were $1.46 for the nine-month period ended September 30, 2000 versus $1.95 in the prior year period.

"We are very proud to report solid results for the third quarter," said Chairman and Chief Executive Officer William P. Foley, II. "Despite a volatile marketplace, the power of the company is clearly evident in this, our second full quarter since the merger with Chicago Title." Highlights included:

Revenues for the third quarter of 2000 were $790 million, compared with $342 million for the third quarter of 1999. For the nine-months ended September 30, 2000, revenues were $1.9 billion, versus $1.0 billion in the prior year period.

52.     On January 16, 2001, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces Plans for Public Offering of Common Stock." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today announced that it plans to make a public offering of 6,000,000 shares of its common stock. The offering will be made under the Company's effective shelf registration

filed with the Securities and Exchange Commission covering the issuance from time to time of up to $400 million of various securities of the Company.

The net proceeds from this offering will be used primarily to repay indebtedness under the Company's existing $800 million syndicated credit agreement. Merrill Lynch & Co. will serve as the lead manager for the offering, with Bear, Stearns & Co., Lehman Brothers and U.S. Bancorp Piper Jaffray serving as co-managers. The underwriters will be granted an over-allotment option of up to 900,000 additional shares. FNF expects to price the equity offering during the week of January 22, 2001.

53.    On January 25, 2001, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces Pricing for Increased Common Stock Offering." The press release provided in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today announced that it has increased its public offering of common stock from 6,000,000 shares to 7,000,000 shares and priced the offering at $33.50 per share. Merrill Lynch & Co. is the lead manager for the offering, with Bear, Stearns & Co., Lehman Brothers and U.S. Bancorp Piper Jaffray serving as co-managers. The Company has granted the underwriters an over-allotment option of up to 1,050,000 additional shares at the offering price. The net proceeds from this offering will be used primarily to repay indebtedness under the Company's existing $800 million syndicated credit agreement.

54.    On February 14, 2001, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Reports 4th Quarter Net Cash EPS of $.68 ." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and twelve-month periods ended December 31, 2000. These results reflect the acquisition of Chicago Title on March 20, 2000. Therefore, prior year comparisons may not be meaningful.

Net cash earnings, which exclude goodwill amortization, were $48.1 million for the fourth quarter of 2000, compared with $11.4 million for the fourth quarter of 1999. Net cash earnings per diluted share were $.68 versus $.39 in the prior year period.

Net earnings were $37.5 million for the fourth quarter of 2000, compared with $8.7 million for the fourth quarter of 1999. Net earnings per diluted share were $.53 versus $.30 in the prior year period.

For the year ended December 31, 2000, net cash earnings, excluding certain non-recurring, non-title related charges, were $155.9 million, compared with $77.5 million for the prior year period. Net cash earnings per diluted share, excluding those charges, were $2.56 for the year ended December 31, 2000 versus $2.47 in the prior year period.

For the year ended December 31, 2000, net earnings, excluding certain non-recurring, non-title related charges, were $121.7 million, compared with $70.9 million for the prior year period. Net earnings per diluted share, excluding those charges, were $2.00 for the year ended December 31, 2000 versus $2.27 in the prior year period.

"Our fourth quarter results clearly show that our five brands continue to build momentum in the market," said Chairman and Chief Executive Officer William P. Foley, II. "Net cash earnings of $48.1 million and net cash earnings per diluted share of $.68 were our strongest quarterly performance of the year. We continue to solidify our position as the nation's largest title insurance and real estate related services company."

55.    On April 26, 2001, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Announces Record First Quarter Results." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three-month period ended March 31, 2001. Because the acquisition of Chicago Title occurred on March 20, 2000, prior year comparisons may not be meaningful.

Net cash earnings, which exclude goodwill amortization, were $56.5 million for the first quarter of 2001, compared with $16.9 million for the first quarter of 2000. Net cash earnings per diluted share were $.72 versus $.50 in the prior year period. The first quarter 2000 results excluded certain non-recurring charges totaling $13.4 million, after applicable income taxes.

Net earnings were $45.0 million for the first quarter of 2001, compared with $15.2 million for the first quarter of 2000. Net earnings per diluted share were $.57 versus $.45 in the prior year period. Including the effect of the non-recurring charges, net earnings and net earnings per diluted share were $1.9 million and $.06, respectively, for the first quarter of 2000.

"We achieved record earnings this quarter," said Chairman and Chief Executive Officer William P. Foley, II. "Both cash earnings of $56.5 million and net earnings of $45.0 million were the highest quarterly results in the history of Fidelity National Financial. We also recently announced the signing of a definitive agreement with VISTAinfo to form a jointly owned real estate services company. This transaction gives us a common platform and a more comprehensive array of products and services to offer to all

participants in a real estate transaction. We can uniquely bundle these real estate data products and services and more efficiently increase the penetration to existing customers, as well as capitalize on new channels of distribution."

56.    On July 25, 2001, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Reports Second Quarter Cash EPS of $1.26." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and six-month periods ended June 30, 2001.

Net cash earnings, which exclude goodwill amortization and the cumulative effect of an accounting change, were $101.3 million for the second quarter of 2001, compared with $42.9 million for the second quarter of 2000. Net cash earnings per diluted share were $1.26 versus $.62 in the prior year period.

Net earnings, before the cumulative effect of an accounting change, were $89.8 million for the second quarter of 2001, compared with $31.4 million for the second quarter of 2000. EITF Statement No. 99-20 requires impairments in the valuation of residual interests in securitizations to be recorded as a reduction to the carrying value through a charge to earnings, rather than as an unrealized loss in stockholders' equity. The charge, recorded as a cumulative effect of accounting change after recurring net earnings, was $5.7 million or $.07 per diluted share. Net earnings per diluted share, before the effect, were $1.12 versus $.46 in the prior year period.

For the six-month period ended June 30, 2001, net cash earnings were $157.8 million, compared with $59.8 million for the prior year period. The prior year results include the results of Chicago Title from March 20, 2000. Net cash earnings per diluted share were $1.99 for the six-month period ended June 30, 2001 versus $1.17 in the prior year period.

For the six-month period ended June 30, 2001, recurring net earnings were $134.8 million, compared with $46.6 million for the prior year period. Recurring net earnings per diluted share were $1.70 for the six-month period ended June 30, 2001 versus $.91 in the prior year period.

"This was a fabulous quarter for Fidelity National Financial," said Chairman and Chief Executive Officer William P. Foley, II. "Cash earnings of over $100 million for the quarter clearly illustrate the dynamic earnings power of our franchise."

57.    On October 24, 2001, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. 3rd Quarter 2001 Earnings Release." The press release stated in part:

> Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and nine-month periods ended September 30, 2001.
>
> Net cash earnings, which exclude goodwill amortization, were $95.3 million for the third quarter of 2001, compared with $47.9 million for the third quarter of 2000. Net cash earnings per diluted share were $1.07 versus $.62 in the prior year period.
>
> Net earnings were $84.1 million for the third quarter of 2001, compared with $37.6 million for the third quarter of 2000. Net earnings per diluted share were $.95 versus $.49 in the prior year period.
>
> For the nine-month period ended September 30, 2001, net cash earnings were $253.1 million, excluding the cumulative effect of an accounting change, compared with $107.7 million for the prior year period. The prior year results include the results of Chicago Title from March 20, 2000 and exclude certain non-recurring, non-title related charges. Net cash earnings per diluted share were $2.88 for the nine-month period ended September 30, 2001 versus $1.70 in the prior year period.
>
> For the nine-month period ended September 30, 2001, recurring net earnings were $218.9 million, compared with $84.2 million for the prior year period. Recurring net earnings per diluted share were $2.49 for the nine-month period ended September 30, 2001 versus $1.33 in the prior year period.
>
> Revenues for the third quarter of 2001 were $1.0 billion, compared with $790 million for the third quarter of 2000. For the nine-month period ended September 30, 2001, revenues were $2.7 billion versus $1.9 billion in the prior year period.
>
> Total title premiums were $700 million for the third quarter of 2001, compared with $562 million for the third quarter of 2000. For the nine-month period ended September 30, 2001, total title premiums were $1.9 billion versus $1.4 billion in the prior year period.
>
> "This was another strong quarter for Fidelity National Financial," said Chairman and Chief Executive Officer William P. Foley, II. "Quarterly revenues topped $1 billion for the first time in the history of our company and despite the market disruption from the terrorist attacks of September 11, we exceeded the consensus street earnings estimate. We believe that reductions in September revenues and earnings were simply deferred into the fourth quarter".

"We also closed our acquisition of VISTAinfo during the third quarter, creating Fidelity National Information Solutions (NASDAQ: FNIS). We have organized FNIS around three main business segments, Lender and Mortgage Services, Real Estate Professional Services and Public Records. We committed to $10 million in first year run rate cost synergies and have been running ahead of that at a $1 million monthly rate. The integration has been aggressive and we are very excited about the prospects for FNIS."

58.     On February 13, 2002, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. 4th Quarter 2001 Earnings Release." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and twelve-month periods ended December 31, 2001.

* * *

Revenues for the fourth quarter of 2001 were a record $1.1 billion, compared with $817 million for the fourth quarter of 2000. For the twelve-month period ended December 31, 2001, revenues were $3.9 billion versus $2.7 billion in the prior year period.

Total title premiums were $792 million for the fourth quarter of 2001, compared with $589 million for the fourth quarter of 2000. For the twelve-month period ended December 31, 2001, total title premiums were $2.7 billion versus $1.9 billion in the prior year period.

"The fourth quarter was a great finish to the best year in the history of our company," said Chairman and Chief Executive Officer William P. Foley, II. "Revenues exceeded $1 billion for the second consecutive quarter and recurring net earnings topped $100 million this quarter, a first for our company and industry. We also had numerous strategic accomplishments in 2001, most notably the successful merger and reorganization of Fidelity National Information Solutions (NASDAQ: FNIS) as a publicly traded company. FNIS provides data, solutions and services to lenders, real estate agents and other participants in the real estate purchase process."

59.     On April 25, 2002, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Reports First Quarter 2002 EPS of $1.14." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three-month period ended March 31, 2002.

\*\*\*

- Revenue for the first quarter of 2002 was $1.1 billion, compared with $778 million for the first quarter of 2001
- Total title premiums were $729 million for the first quarter of 2002 versus $535 million for the prior year period
- Real estate related services revenue was $96 million, compared with $57 million for the first quarter of 2001
- Cash flow from operations was $165 million for the first quarter of 2002
- Return on average equity was 23.9 percent for the first quarter of 2002
- Fidelity National Information Solutions (NASDAQ: FNIS) had a market capitalization of more than $500 million at March 31, 2002;
- FNF's investment was valued approximately $400 million, or $4.60 per share at quarter-end
- Micro General Corporation (NASDAQ: FNIS) had a market capitalization of more than $200 million at March 31, 2002; FNF's investment was valued at approximately $125 million, or $1.45 per share at quarter-end

"This quarter was a great start to 2002," said Chairman and Chief Executive Officer William P. Foley, II. "We achieved another milestone as revenue exceeded $1 billion for the third consecutive quarter for the first time in Company history. Despite slightly higher mortgage rates in the quarter, cash flow from operations and return on equity were tremendous. We also were thrilled to be named to the 2002 Fortune 500, a first ever achievement for FNF. FNF was also named to the Forbes Super 500, ranking 403rd in revenue and 239 in profits. We have grown from an organization that went public in 1987 with $100 million in annual revenue to the clear industry leader with nearly $3.9 billion in revenue in 2001."

60.    On July 24, 2002, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Reports $1.13 in Second Quarter 2002 EPS." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and six-month periods ended June 30, 2002.

\* \* \*

- Revenue for the second quarter of 2002 was $1.1 billion, compared with $962 million for the second quarter of 2001; revenue for the six

months ended June 30, 2002 was $2.2 billion compared with $1.7 billion in the prior year period

· Total title premiums were $796 million for the second quarter of 2002 versus $668 million for the second quarter of 2001; title premiums for the six months ended June 30, 2002 were $1.5 billion compared with $1.2 billion in the prior year period

· Real estate related services revenue was $99 million, compared with $62 million for the second quarter of 2001

· Cash flow from operations was $204 million for the second quarter of 2002 and $368 for the six months ended June 30, 2002

· Annualized return on average equity was 24.8 percent for the second quarter of 2002

· The Company initiated its systematic stock repurchase program on May 15, 2002, repurchasing 318,500 shares of its common stock during the quarter

"Our momentum has clearly continued into the second quarter," said Chairman and Chief Executive Officer William P. Foley, II. "Revenue has now exceeded $1 billion for the last four consecutive quarters, a first for our company and the title insurance industry. Our cash flow from operations of $204 million and return on equity performance of 24.8 percent continue to be tremendous. Because of the strength of our cash flows and the market's lack of recognition of the financial performance of FNF, we implemented a three-year stock repurchase program in May where we are devoting a portion of our annual cash flow from operations to the systematic repurchase of shares of our common stock. In the first six weeks of the program through June 30, we have repurchased approximately $9.5 million of stock."

61.     On October 23, 2002, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Reports $1.45 in EPS for Third Quarter 2002. "The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and nine-month periods ended September 30, 2002.

* * *

· Revenue for the third quarter of 2002 was $1.3 billion, compared with $1.0 billion for the third quarter of 2001; revenue for the nine months ended September 30, 2002 was $3.5 billion compared with $2.7 billion in the prior year period

· Total title premiums were $883 million for the third quarter of 2002 versus $700 million for the third quarter of 2001; title premiums for the nine months ended September 30, 2002

32

were $2.4 billion compared with $1.9 billion in the prior year period
- Real estate related services revenue was $114 million, compared with $77 million for the third quarter of 2001
- Cash flow from operations was $274 million for the third quarter of 2002 and $642 for the nine months ended September 30, 2002
- Annualized return on average equity was 28.8 percent for the third quarter of 2002
- The Company repurchased 640,000 shares of its common stock during the third quarter and has repurchased 958,500 shares from inception of its systematic stock repurchase program on May 15, 2002 through September 30, 2002

"This was clearly the most profitable quarter in the history of our company," said Chairman and Chief Executive Officer William P. Foley, II. "We achieved revenue of $1.3 billion and net earnings of $144 million, both quarterly records for FNF. Our cash flow generation remains tremendous, with $274 million in cash flow in the third quarter and $642 million for the first nine months of the year. We continue to devote a portion of this cash flow to the systematic repurchase of our common stock. We repurchased $18.6 million of stock during the third quarter and have repurchased $28.1 million of stock since implementing the program in May of this year."

62.    On January 29, 2003, the Individual Defendants caused Fidelity to issue a

press release entitled "Fidelity National Financial Reports $1.77 in EPS for Fourth Quarter

2002; $5.38 for 2002." The press release stated in part:

Fidelity National Financial, Inc., the nation's largest provider of title insurance and real estate related products and services, today reported operating results for the three and twelve-month periods ended December 31, 2002.

* * *

- Revenue for the fourth quarter of 2002 was a company record $1.6 billion, compared with $1.1 billion for the fourth quarter of 2001; revenue for the twelve months ended December 31, 2002 was a record $5.1 billion compared with $3.9 billion in the prior year period
- Total title premiums were $1.1 billion for the fourth quarter of 2002 versus $792 million for the fourth quarter of 2001; title premiums for the twelve months ended December 31, 2002 were $3.5 billion compared with $2.7 billion in the prior year period
- Real estate related services revenue was $127 million for the fourth quarter of 2002, compared with $91 million for the fourth quarter of 2001

· Cash flow from operations was $245 million for the fourth quarter of 2002 and $814 million for the twelve months ended December 31, 2002

· Annualized return on average equity was 32.1 percent for the fourth quarter of 2002 and 27.3 percent for the twelve months ended December 31, 2002

· The Company repurchased 1,076,670 shares of its common stock during the fourth quarter and has repurchased 2,035,170 shares from inception of its systematic stock repurchase program on May 15, 2002 through December 31, 2002

"The fourth quarter was a great finish to the strongest year in the history of our company," said Chairman and Chief Executive Officer William P. Foley, II. "Fourth quarter revenue of $1.6 billion and full year revenue of $5.1 billion were both records for FNF. We also achieved record net earnings of $175 million for the fourth quarter and $532 million for the full year 2002. Cash flow from operations of $245 million for the quarter and $814 million for the year were fabulous. We also continue to systematically repurchase our stock, devoting $33 million in the fourth quarter and $61 million since the inception of the program in May 2002."

63.    On April 1, 2003, the Individual Defendants caused Fidelity to issue a press release entitled " FNF Closes Acquisition of Financial Services Division of ALLTEL Information Services." The press release stated in part:

Fidelity National Financial, Inc. today announced the closing of its acquisition of the financial services division of ALLTEL Information Services ("AIS"), a wholly owned subsidiary of ALLTEL Corporation (NYSE: AT). FNF has renamed the division Fidelity Information Services and it will operate as a wholly owned subsidiary of FNF.

***

Fidelity Information Services had revenue of $820 million and operating income of $151 million in 2002. The purchase price of $1.05 billion, subject to certain adjustments, consisted of $775 million in cash and $275 million in FNF stock issued to ALLTEL Corporation. FNF funded the cash portion of the purchase price through the issuance of $250 million in 5.25 percent ten-year notes and $525 million in available cash. FNF funded the stock portion of the purchase price through the issuance of approximately 8.2 million shares of FNF common stock, all of which is subject to a one-year lock-up agreement. The transaction will be accretive in the first year and beyond.

***

Fidelity National Financial, Inc., number 326 on the Fortune 500, is a provider of products, services and solutions to the real estate and financial

services industries. The Company had total revenue of $5.1 billion and earned more than $530 million in 2002, with cash flow from operations of nearly $815 million. FNF is the nation's largest title insurance company and also performs other real estate-related services such as escrow, default management, mortgage loan fulfillment, exchange intermediary services and homeowners, flood and home warranty insurance. FNF is also one of the world's largest providers of information-based technology solutions and processing services to the mortgage and financial services industries through its subsidiary Fidelity Information Services.

64.    On April 23, 2003, the Individual Defendants caused Fidelity to issue a press release entitled "Fidelity National Financial, Inc. Reports First Quarter 2003 EPS of $1.44."

The press release stated in part:

> Fidelity National Financial, Inc., a Fortune 500 provider of products, services and solutions to the real estate and financial services industries, today reported operating results for the three-month period ended March 31, 2003.
>
> 1st Quarter 2003 Net Earnings: $144 million $1.44 per diluted share.
> 1st Quarter 2002 Net Earnings: $101 million $1.03 per diluted share.
>
> · Revenue for the first quarter of 2003 was $1.4 billion, compared with $1.1 billion for the first quarter of 2002
> · Total title premiums were $968 million for the first quarter of 2003 versus $729 million for the prior year period
> · Real estate related services revenue was $174 million, compared with $116 million for the first quarter of 2002
> · Cash flow from operations was $189 million for the first quarter of 2003
> · Annualized return on average equity was 24.0 percent for the first quarter of 2003
> · The Company repurchased 598,900 shares of its common stock for $19.7 million during the first quarter and has repurchased a total of 2,634,070 shares from inception of its systematic repurchase program on May 15, 2002 through March 31, 2003
>
> "Our momentum has continued into 2003, both financially and strategically," said Chairman and Chief Executive Officer William P. Foley, II. "Most importantly, we closed the AIS acquisition on April 1, forming Fidelity Information Services. The first quarter results do not include any impact of this new business. Fidelity Information Services accelerates our ongoing evolution into a fully diversified provider of products, services and solutions to the real estate and financial services industries and provides a significant and recurring stream of revenue and earnings that is not specifically tied to the level of mortgage originations."